Gentlemen, just stay right there for a second. The court doesn't see how this arrangement can work today, splitting an initial presentation with two rebuttals split and rebuttals, surrebuttals. What we propose is that Mr. Josepher, you'll handle the opening argument, all of it for your issues, validity and infringement, and Mr. Galvin, you'll handle the rebuttal, and we'll be a little liberal with letting you make your arguments as you need to in both of those. We'll give you, you know, it'll be nine minutes for the opening and six for the rebuttal. Will you be able to manage that? Obviously, we'll do it our way. Mr. Josepher, you can handle both the validity and the infringement, make all the arguments you need to at the outset. We'll work with it. Our proposal had been, because we have different accused products, I understand that. that we're not in a position to speak to Semantex infringement issues. And because of that, we had also figured as long as we had to split it, that Semantex counsel would also handle the Emerald 97 included issues that are set forth in their brief. We understand the problem, and we really just want to be of help to you. The trouble is the court, you know, you understand the court thinks this is its time, and we don't see how we could develop a line of questioning if there's three minutes and then you're sitting down. So let's at least start this direction, Mr. Josepher. We'll start with you, thinking you're going to speak for nine minutes, and Mr. Galvin, you'll have six coming back. Mr. Scherkenbach, I suppose you are permitted a surrebuttal, but we're putting some restrictions on your opposing counsel. We're hoping that your surrebuttal, if necessary at all, will be very brief. That you'll concentrate your argument on your initial time before the court. That's fine, Your Honor. If we could proceed from that, and if at some point you hit an issue you simply can't address, the court will understand that and allow Mr. Galvin to quickly substitute for you at the podium. You may proceed. Thank you, Your Honor. I do apologize. It's the different accused products that led to the issue. We understood that. I do understand, but we just want to help you out here. I'd also like to start with Real Secure, because that's ISS's own prior art product that did exactly what the patents claim. The only issue about Real Secure is whether it automatically received and integrated reports when it combined and organized reports into the activity tree that's reprinted in our briefs. And that issue is especially straightforward because everyone agrees that correlating is a type of integrating, and the court construed correlating to be combining. But the jury found it only reiterates, and it's a jury finding. Where is our basis for overturning that? Because the evidence on which the jury might have relied was the testimony of their expert, but their expert's testimony was flatly contrary to the claim construction. The court construed correlating to be combining reports to reflect underlying commonalities, nothing more. And I don't believe that there is a factual dispute about whether Real Secure did that, combined reports to reflect underlying commonalities. When it combined reports into the activity tree according to the source, the destination, or the type of event, and when it also combined identical reports into a single entry, their expert's testimony was, well, that's not sufficiently meaningful. But that's wrong as a matter of law because the claim construction doesn't call for meaningfulness beyond combining reports to reflect underlying commonalities. And they also don't, as far as I can tell, they don't argue that this combining of reports that people paid for, bought this product so they would have that, is completely meaningless or random. Their argument seems to be that, well, it's not sufficiently meaningful. But that's certainly not a claim term. And as in cases like I of 8 or as in the first appeal in this case. I mean, the problem is that correlates is sort of a fuzzy term, right? Well, that's why the court construed it to be combining reports, putting reports together in a way that reflects underlying commonalities. But something more than reiterating. Right, now. And the jury seems to say, well, it just reiterates. You still have that problem. It's facts and how do we look behind the curtain? Well, because, I mean, you're right, the definition of integrate, right, which is the one of the terms, it refers to merely reiterating. Reform integration. Merely reiterating. But we know more specifically what that means because everyone agrees that correlating is a type of integrating. And correlating is just combining reports to reflect underlying commonalities. Nothing more under the undisputed claim construction. And their expert didn't dispute that, yes, real secure combined reports. And he didn't dispute that these are commonalities. In fact, the source and destination are what their expert testified were the commonalities for purposes of infringement. So we know that these are commonalities and the reports are being combined in this way. And under the undisputed claim construction of correlation as a type of integration, that's all that's required as a matter of law. Also, I think it might be important to understand what reiterated means. These patent claims, all they call for is reorganizing data in a way that's helpful to the user. There are some other unasserted dependent claims that call for the system to actually do something. To invoke countermeasures, for example. What about Emerald? Emerald 97? Yeah. Yeah, again, that was the issue that Mr. Galvin was planning on addressing. But our basic point there is that from this court's first decision in this case, it's undisputed that Emerald 97 anticipates all but one of the elements. And that element is the categories of network traffic data. We have several basic points on that. First, if you just look at the categories of network traffic data that are set forth here, they include network connection requests, network connection denials. Before you even get into specific references, those are obvious to try. And, in fact, some of these categories are necessary to try because there's no other way to do some of these things. Emerald 97 then specifically references as related art for this purpose, intrusive activity, 91. And intrusive activity, again, specifically sets forth some of these network categories. So I think the only place that they can even try to go is to say, well, would there have been a reasonable expectation of success? But on that issue, there were prior art products that actually were using these categories to monitor networks. And that's why when you take this court's law of the case from the first decision and you put it together with the references I just mentioned, it seems to us to be an overwhelming case for obviousness, which especially considering that obviousness is, once you take those historical facts, obviousness is ultimately a question of law. Now, if the court would like, I should do our infringement issues, the ISS-specific infringement issues, because I won't be back up. And as to infringement with respect to ISS, they clearly have buyer's remorse because the theories they're trotting out on appeal are, for the most part, ones they did not rely on before the jury. You agreed that on the system's claim that all that's required is capability, right? Absolutely not. No? And here's why. The system claims require that the hierarchical monitor, which in our case is site protector, it must be adapted to automatically receive and integrate reports. And what adapts it to – well, I guess on capabilities, yes or no, depending on what you mean. Because what adapts the system to do that, what creates the infringing system, is the actual installation of the APC component. Yeah, but if the APC component is installed, you would agree that the system's claims are infringed, right? Well, if the APC component is installed and everything else is deployed in an enterprise network, yes. But our point is that APC does have to be installed. Because if APC is not – it's not just the purchase of APC that adapts site protector and makes site protector capable of performing the relevant functions. But they're documents that say it was automatically installed. Yeah, which is wrong. This is one of the key points. They forfeited that theory twice at trial, which is why we don't have our evidence in on it. At trial, they only argued that the capability is required. They never argued at trial, never put us on notice of this automatic installation theory at trial. Their theory there was installation. It didn't matter if it was installed. And then in the JMOL briefing, they forfeited a second time by, again, not presenting this theory. In fact, at trial, their expert, Dr. Kasidis, admitted that IAC and APC, the two relevant components of fusion, have to be separately installed such that APC is not automatically installed. Why did they use the two documents for at trial? These are both documents that are more than 30 pages long. And the documents were in there, for example, with respect to intent, that we intended that APC would be installed in some fashion. And therefore, they view that as relevant to intent with respect to inducement. But their expert admitted at trial that there was no automatic installation. And he was right. I mean, this is the thing about it. He was right. We don't have the evidence in the record to show that, precisely because we weren't on notice that this was their theory. But first, they forfeited the theory by not presenting it. And second, under decisions of this court, such as Fresenius, if they want to defend a jury verdict by pointing to isolated snippets that are somewhere in the record, they had to actually call the jury's attention to that and call our attention to it so that it actually might have been a plausible basis for the jury verdict and so that we would have been on notice of it. It's important to understand that a jury can get any number of very long documents with attachments and whatnot, but if you don't put anybody on notice of that, you lose the jury trial. You later say, oh, look, there's something buried somewhere in the record about a theory nobody else knew about. That's not a fair trial anymore. That's the kind of gamesmanship that this court's forfeiture and waiver decisions and that Fresenius expressly preclude. And that's why I'd be happy to go on about why it is, in fact, that APC is not automatically installed by any stretch of the imagination, but it's not in the record is the problem that I have there. Their other theory on infringement then ends up being that, well, surely somebody must have infringed. But this court's never been willing to just presume infringement in circumstances like this, where the product is intended and marketed to be configured in a non-infringing configuration, as well as in an infringing one. And especially here, where the default configuration, the automatic installation, would not install APC. Instead, a user would have to deliberately go in and install APC. In circumstances like that, that's basically this court's recent decision in Fujitsu. And in those types of circumstances, this court's always required evidence, whatever it may be, but actual evidence of a specific instance of direct infringement. The court's never been willing to simply presume infringement in those circumstances. If the court has no further questions, I'll give co-counsel the extra eight seconds. All right, thank you. Thank you. Mr. Schierkenbach? Thank you, Your Honors. Good morning. May it please the court. You have a problem about Emerald. Talk about Emerald, would you? Emerald, sure. It seemed to me that there was testimony from both sides, experts, that this kind of network traffic that's referred to in the claims was used by past detection devices. So it was known to use this kind of traffic. The court's not willing. The court's not willing. Thank you. In the abstract, that's true, yes. There were prior systems that analyzed some of the types of network traffic data. They were different systems. They operated in different ways than the claimed system. So this is a case, like many of the obviousness cases, where the defendant points to the ability to find an element in the prior art here, one over there, and say, well, it would have been obvious to combine them. Just to clarify, Your Honor, I think you're asking me about the combination of intrusive activity and Emerald? Well, not necessarily. It's the question of obviousness over Emerald, both based on intrusive activity and based on the testimony that it was common in this business to use this network traffic for detection and monitoring. Right. So let me break that up. Emerald itself does not talk about monitoring any of the kinds of traffic that are claimed. I didn't ask about anticipation. Okay. But turning even to obviousness, there's a lot of evidence in the record that belies the assertion that it seems like it should have been simple to go look at these other kinds of traffic in the context of this system. Number one. The question is not simple. The question is whether it would have been obvious for somebody to try to use this kind of traffic, since it was so well known, to turn to that in past prior art detection and monitoring systems. And I think the best evidence on that, Your Honor, is that it wasn't obvious to the inventors themselves to try. Emerald 97, if you read it, sets out in apparent That seems to suggest that if the inventors didn't find it obvious, that it's not obvious to anybody else. Well, no, I'm not making a categorical statement. I'm saying this is evidence on that issue that the jury heard. So the inventors at the time, they wrote this sort of architectural paper, Emerald 97. These were people of extreme skill in the art. They had done key prior art systems, the Eid systems, the Neid systems. They cite to the intrusive article. They know about it. Sure, they did. But it's never been, as far as I know the law, that because one reference cites another reference, ergo motivation to combine those references to yield a later claimed invention. It's relevant, sure, it's relevant to their case that there was a citation, but it's by no means dispositive and there was testimony. Well, if an enterprise system is 20 to 50 computers, why does that present scalability problems with respect to a local area network? Well, 20 to 40 is probably a local area network. The enterprise networks, the sort of context we're talking about for these patents, is thousands and thousands of computers. And the prior art and the But didn't our experts tell us, one expert, that it could be 20 or more and the other 50 or more? So if we look at the bottom end of that, 20 to 50 computers, that doesn't seem, as you say, to present scalability problems with regard to a land. Well, again, I'm not entirely sure what you mean by scalability. Isn't that the issue that your expert used primarily to avoid the obviousness? Well, no, no, he didn't, actually. Whether you focus on what an enterprise is and the number of computers or not, this intrusive activity article, the other prior art, didn't have all the elements of the claim anyway. So the prior art wasn't distinguished on the basis of enterprise network. I mean, this is an argument that actually didn't even come up until during the course of trial. This is something defendants fastened up. Well, then what is the distinction? If it's not scalability, what is the reason that you wouldn't look at this prior art? Well, it's because it's a fundamentally different kind of system that was, in the case of intrusive activity in particular, and that's the combination they rely on, intrusive activity plus Emerald. That paper, if you look at it, is about, it says don't look at the network traffic data because there's too much of it. The paper, in fact, says we tried that. The author of that was their expert, Todd Heberlein. He tried looking directly at network traffic data. Too much data, couldn't deal with it. The intrusive activity paper is actually about looking at something else, looking at abstract objects that represent characteristics about the network. So it's actually a, and there was testimony about this, again, from Dr. Cassidis and other folks at trial. It's a fundamentally different approach to the problem of detecting intrusive activity. Is it of some relevance? Sure. We can't say otherwise. I mean, the inventors of our system cited it. These are academic folks. They're very generous in citing related work. But that's a far cry from saying go look there for a specific kind of network traffic and look at how they might analyze it and use that in our system. So what did, but put aside intrusive activity for a moment. Okay. Your expert said that in the prior art they looked at these kinds of network traffic for monitoring detection. Why did they say that someone with the emerald paper in hand wouldn't find it obvious to look to this kind of network traffic? What did they say about that? If it's not scalability, what is it? Well, I don't think the inventors themselves directly testified as to why it wasn't obvious to look at that kind of traffic. Okay. What the record shows is they said what they thought it was obvious to look at. So there isn't any testimony that it wouldn't be obvious to look at this other kind of traffic? No, there is. Just not from the inventors. I'm trying to answer just your question. Dr. Casitas said that it would not be obvious to, if you're faced with the problem of emerald, to look to the monitoring of the kind of traffic that was discussed in intrusive activity because fundamentally they're different systems. No, no, I actually put aside intrusive activity. I'm talking about the more general established fact that quite apart from intrusive activity, it was common to look at this kind of network traffic. What did your experts say about why it wouldn't be obvious to do that in connection with emerald? Without a concrete example, I don't have a concrete answer for you, Your Honor, because, again, the only combination they relied on was emerald plus intrusive activity. I mean, it was known, SRI's own prior art, real secure. I mean, there were systems out there that looked at some of the categories of network traffic recited in the claims for different purposes in the context of different systems. The question is whether looking at that activity in the context of an enterprise network system where you have multiple monitors. What you're saying is you can't point me to any testimony where they said it wouldn't be obvious to look at these other kinds of network traffic. At the moment, no. We'll see if we can find you a site. But please allow me to finish. I want to answer the question you asked before because it's directly related to this issue. The inventors themselves testified it was surely not obvious to them because when they, again, they were familiar with a lot of these prior systems. They were the architects of two of the premier systems, IDEs and NIDEs. They had done monitoring of traffic. And in their emerald paper, when they were thinking of adapting it to a larger enterprise, they listed a number of things that they thought would be the most promising. None of those worked out. None of them ended up being among the claimed categories of traffic. None of them worked out. That's pretty powerful evidence that they didn't even think to try them themselves. And the only evidence in the record that it would have been obvious to try comes from defendant's expert, who, of course, the jury wasn't required to believe, who, oh, by the way, himself happened to have been the author of the paper they want to use to combine with emerald. So you've got a bias and a credibility issue there. The standard being substantial evidence, I don't see that. But your expert also testified that it was common to look at these kinds of network traffic for monitoring detection in the prior part, correct? For different purposes in different systems, yes. Not all of them. I mean, I don't want to overstate it generally, but it is the case that some of the recited categories were monitored by prior systems. Different systems used for different purposes. Again, it's not as though you could take an aspect of that system and combine it with the rest of the disclosure of emerald, and voila, you wind up with the patented invention. Not at all. These systems are incompatible. They're fundamentally different in terms of their architecture, and you can't do that. So if I can go on to, I don't know if you want to comment on real secure, but I do want to get to my infringement issues. Just quickly on real secure, this is ISS's fundamental and validity argument, and the fundamental problem with it is they actually ignore the claim construction for receiving and integrating. They made the same argument to Judge Robinson, and Judge Robinson properly rejected it. They focus only on the construction of the dependent claim correlating, and they ignore that the independent claim requires that receiving and integrating requires combining reports into a different end product, something more than simply collecting and reiterating data. There's no different end product. They've never identified one. No witness testified that there was one. That's the end of the story on real secure. All right, now let me get to, please, if I can, infringement, because this obviously is our issue and of great importance to us. The fundamental issue here is whether capability alone is enough, and on these claims, clearly it is. These claims use the phrase adapted to. It really couldn't be clearer for the system claims. It actually turns out that this court very recently construed that language adapted to in the Power One case and said, yes, capability is enough. Did you dispute at trial whether the APC was installed by default? Well, we didn't, but this is an interesting turn of events here. The defendants never raised the issue of capability or that they had no non-infringement defense at trial, period, other than use. It was all about use. It was all about the method claims. They never contested that they had the capability upon these products being installed. Since they never raised it, why would we have affirmatively addressed it? Because we have the burden of proof, that's why. We did put in the evidence, though, Your Honor. We did put in quite a bit of product manuals and brochures and instructions that do talk about installing necessary components, that they are installed, that they are designed to work together, that they, in fact, work together, that the defendants teach their customers how to use them together in the infringing way. All of that's in the record, and I don't think it's incumbent by us, and I'm certainly not aware of any authority of this court that says we have to anticipate a defense they haven't raised by pointing out. But I didn't see any direct evidence that APC was installed by default. There is, Your Honor. There actually is. There are a couple, and I'll give you a couple of sites. The Fusion 2.0 product instructions say APC is enabled by default. That's at A23345. What did you use that document for at trial? We used it. I think counsel is correct. We used it in two broad contexts. Counsel referred to the context of showing intent to induce infringement, and we used it more broadly in the context of establishing infringement generally, even direct infringement by, in this case, it would be ISS itself, because, of course, in addition to whatever customers do with these things, there's quite a bit of evidence in this record that the defendants themselves used the products in the claimed arrangement, demonstrated them for their customers. If I remember that place in the Fusion record, though, it says you must have enabled the APC. It doesn't say anything about default installation. It actually does say enabled by default, Your Honor. That site I gave you says that the APC is enabled by default. Both pieces of the Fusion product, there's two pieces of this product, IAC and APC. They're both enabled by default. There's another site, the document talking about the Fusion installer, the process of installing Fusion overall, says that it installs APC. These are in our brief. That one is at A30467. So you've got evidence in the record that these are installed by default. But is Fresnius right when it suggests that you can't just post-trial for a document in the record that has never been called to the jury's attention for this purpose and say, oh, well, there was plenty of evidence for the jury to do it? I mean, is Fresnius right about that? Well, I'm not in a position to say that the case is wrong. I don't think that case presents an issue for us on these facts. Well, but isn't it somewhat similar in the sense that there was a reference to Step Motors or whatever it was somewhere in the record, but we said, no, you can't rely on that because it was never called to the jury's attention, never argued to the jury? Insofar as it talks about relying on a document that wasn't specifically argued to the jury, I suppose you could say it's in the ballpark. But the jury gets the evidence. The evidence is in the room. The documents were talked about for another purpose. It isn't as though this is a needle in a haystack kind of thing. These documents show how the products work. They say you install them. When you install it, it's enabled by default. It's multiple documents. It's not just one document. They didn't call a witness to dispute the document, and they couldn't. I mean, the piece of evidence, after all, that they're relying on here is a single leading question of our expert, which we say lacks foundation. And he says, I don't really know. Maybe I saw that. An equivocal statement by our expert. We've had a jury verdict in our favor. I just don't see how, under any case I'm familiar with from this court, how that can mean that that's jamal and that verdict gets thrown out when there's far more evidence in the record of the contrary. And they know this happens. I mean, with all due respect, there's no question these products are installed. There's no question these products infringe when they're installed in the way they're intended to be installed and used. This set of facts distinguishes this case from really any of the other indirect infringement cases on which they're trying to rely. I'm out of time. Thank you, Mr. Schirkenbach. Thank you. We'll give Mr. Schirkenbach two minutes. Would you give Mr. Galvin two extra minutes here? That will keep the time even. Mr. Galvin, you may proceed. Thank you, Your Honor. May it please the Court. I'd like to start with the issue of Emerald 1997 because the Court had raised some issues with that. In particular, I think it's important to stress that the undisputed evidence of record, both from the SRI's expert as well as from the inventor, is that others had successfully monitored network connection requests prior to the filing of this patent. That is undisputed. Therefore, these categories were known and were used successfully beyond dispute. In particular, the evidence that was submitted at trial was that the ISS real secure product itself, which is an accused subsequent version's enterprise networking system, monitored network connection requests to detect SIM flood attacks. That's the testimony from the inventor. The SIM flood attacks are an example contained in the patent of the kind of attacks, the kind of intrusion detection, that the patented system was designed to go after. So you have a clear teaching in the art that others succeeded in using these categories. They are the most obvious to try. There is a predictable set of these categories. When you're defining a set of network protocols for moving information across the Internet, you need to have a well-defined set of categories such as network connection requests and denials. I want to connect to your network. You reject it. You need to measure network packet data volume. Those are the precise kinds of attacks that systems were designed to detect. Secondly, on the issue of scalability, I hear the argument was made here that that wasn't the distinction. That seemed to be the only distinction that was offered by Dr. Cassidis, to argue that the intrusive activity system was not scalable. But as this court noted, they didn't argue that enterprise networks were reduced to systems that required thousands of nodes. Even their experts said a system with 50 computers could be sufficient to constitute an enterprise network. Fundamentally, the question of scalability had already been resolved by the Emerald 1997 reference, as this court found. This court found that Emerald 1997... They're not arguing scalability with respect to the expert testimony about the prior art, aside from this intrusion detection. Right. They're not saying that scalability relates to the expert testimony, that it was common to use these kinds of network data in prior art systems, as I understand it. Well, you may be right, Your Honor. I think the only point that I wanted to make was that the prior art clearly taught a scalable system, which was the Emerald 1997 reference, which was a method for detecting suspicious activity in an enterprise network. So that was already resolved. The only question was, was there sufficient... Was there evidence in the record that was undisputed that established success in monitoring these categories? And there was. And this question of obviousness is ultimately an issue of law. On the undisputed evidence, this court can conclude, as a matter of law, that the claims are invalid. What about the infringement issue with respect to Symantec? There's proof of licensing. Why isn't that sufficient to show that it was installed? It doesn't establish that the products were used in connection with each other. But let's talk about the systems and why it's wrong. Doesn't that establish a capability? No, it does not. Why not? SRI's theory required three components to be deployed, the manager products and the two SGS monitor products. All three needed to be deployed in order to satisfy the system claim under SRI's own theory. The license authorization that is cited to buy SRI was not a license to use the products in conjunction with each other. The license was a license to use the lower-level SGS monitor to detect intrusion detection systems. So the testimony that they cite, Mr. Lev's testimony, was that the SGS monitor could be used for multi-purposes. It could be used to monitor antivirus. It could be used as a firewall. It could be used for intrusion detection. This was sort of the selling point of the box, if you will, that it could do multiple things. A user had to provide, a purchaser had to separately license which functionality they wanted to use. So the testimony of 25% is only that this lower-level monitor, the accused lower-level monitor, that only 25% at most of the Symantec customers even turned on that intrusion detection system functionality. But that is not sufficient to establish infringement under the system claim because they would still need proof that there was a deployment of two SGS lower-level monitors as well as the manager product. And there's no evidence in the record. There simply is no evidence in the record of any customer purchasing a manager product and two SGS products. They rested their case-in-chief on infringement without submitting any evidence of sales. Now they obviously regret that at this point. Does it sort of make sense to license this feature without making the combination and using the things together? Yes, Your Honor. The boxes can be used. It was undisputed from SRI's own expert that the SGS monitor can be used independently. It could be used to detect and respond to intrusive attacks. So you could deploy the SGS monitor at the gateway to your network. If you detected a sin flood attack or a denial of service attack, the box would detect it, and it could take action. It could close the network connection so it didn't keep getting bombarded with information. It, on the box itself, could store information that a user could log in and see reports of intrusion detection. It doesn't need to be used in conjunction with a manager product, and there's no evidence on this record that it ever was. I also want to address briefly this issue of adaptive versus capability. We think that the claims are clear. The claims require, for the system claims, that the monitors be deployed. Claim language says that the monitors must be deployed so a sale isn't sufficient. And the claim language clearly says that the hierarchical monitor must be adapted to automatically receive and integrate reports. And the district court, in its opinion, found that there was no evidence of any configuration of any semantic products to work in that way. Adapted, and the district court properly rejected the notion that it was simply enough that it was capable of being adapted. Because there's no evidence that the configuration necessary to ensure that those two modes could talk together actually occurred. Briefly, one last point. There's an argument made in SRI's briefing that the manager product, out of the box, somehow could communicate with the SGS monitor. That is simply not true. The evidence of the record establishes that the only monitors that, out of the box, on the box functionality, that the manager product could communicate with were third-party products. There was a checkpoint product, a PIX product, other products. There's no documentation in the record that establishes that the SGS monitor could, that the manager product could automatically receive and integrate reports from the SGS monitor. Thank you, Your Honor. Thank you, Mr. Galvin. Mr. Schickenbach, you have two minutes. Thank you, Your Honor. I'm going to spend my two minutes on this last issue of semantic and capability. Again, to go back to the evidence as opposed to the argument they want to make, this issue boils down very simply to was the jury entitled to believe what their documents showed, or is it enough for them to be able to say that there's no direct evidence of a specific customer doing X? And, again, under this Court's case law, the answer to that question is clear. Capability is enough. Let me give you a couple of record sites because I think they're really critical to correct a few of the arguments you just heard. Correlation of the higher level monitors in the Symantec system is an out-of-the-box capability. It is there out-of-the-box. Appendix 30091, 30110, 30128. And there are other examples in the appendix where the jury saw this. The sensors, and this is particularly important in light of what you just heard, the sensors, yes, you have to have two or more, which many of their documents show, which they teach their customers. The sensors can generate IDS events for correlation upon installation. Their own witness testified to this, a Lev testimony. That's at A1054. He said, and I quote, The software is there. You have to buy a license to run it, to use it. Their argument might have some force for the method claims. For the system claims, it is neither here nor there. That's the end of the story on the system claims for the Symantec system. As for use itself, just turning to use and the method claims in the few seconds I have left, again, there is very substantial circumstantial evidence of use. Their marketing materials, their product manuals, the fact that they sell special licenses to use the functionality, as Judge Dyke said, why is somebody going to buy that if they're not going to use them together? Counsel had an answer to that, but that's not evidence in the record. That's an argument, but there's no evidence in the record. Thank you. Thank you, Mr. Schurkenbach.